1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    BENJAMIN VANFOSSAN,                     No.  1:20-cv-00173-EPG (PC)

12                 Plaintiff,                 FINDINGS AND RECOMMENDATIONS,
                                              RECOMMENDING THAT THIS ACTION
13         v.                                 PROCEED ON PLAINTIFF'S CLAIMS
                                              AGAINST DEFENDANTS AMAYA,
14    ESTELA ALCANTAR, et al.,                ALKIRE, CRUZ, GONZALES, HUERTA,
                                              LEWANDOWSKI AND ROBLES FOR
15                 Defendants.                VIOLATING PLAINTIFF'S RIGHT TO DUE
                                              PROCESS AND THAT ALL OTHER
16                                            CLAIMS AND DEFENDANTS BE
                                              DISMISSED
17
                                              (ECF NO. 15)
18
                                              TWENTY-ONE DAY DEADLINE
19
                                              ORDER DIRECTING CLERK TO APPOINT
20                                            DISTRICT JUDGE

21

22         Plaintiff Benjamin VanFossan ("Plaintiff") is a state inmate proceeding *pro se* and *in*

23    *forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed the

24    Complaint commencing this action on January 24, 2020, (ECF No. 1), which the Court screened.

25    Then on August 12, 2020, Plaintiff filed a First Amended Complaint, (ECF No. 15), and

26    objections to the Court's earlier screening order (ECF No. 16). The First Amended Complaint

27    brings claims concerning an altercation Plaintiff had with Defendant Estela Alcantar and the

28    resulting disciplinary measures taken against him.

                                                1

1    The Court has reviewed the First Amended Complaint and finds, for screening purposes,

2    that it states cognizable claims against Defendants John Amaya, R. Alkire, Cruz, A. Gonzales, Jr.,

3    Richard Huerta, Theresa Lewandowski and M. Robles for violating Plaintiff's right to due

4    process.

5        Plaintiff has twenty-one (21) days from the date of service of these findings and

6    recommendations to file his objections.

7    **I.      SCREENING REQUIREMENT**

8        The Court is required to screen complaints brought by inmates seeking relief against a

9    governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The

10   Court must dismiss a complaint or portion thereof if the inmate has raised claims that are legally

11   "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek

12   monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

13   As Plaintiff is proceeding *in forma pauperis*, the Court may also screen the complaint under 28

14   U.S.C. § 1915. "Notwithstanding any filing fee, or any portion thereof, that may have been paid,

15   the court shall dismiss the case at any time if the court determines that the action or appeal fails to

16   state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

17       A complaint is required to contain "a short and plain statement of the claim showing that

18   the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not

19   required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

20   conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell*

21   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual

22   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting

23   *Twombly*, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this

24   plausibility standard. *Id.* at 679. While a plaintiff's allegations are taken as true, courts "are not

25   required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc*., 572 F.3d 677, 681

26   (9th Cir. 2009) (citation and quotation marks omitted). Additionally, a plaintiff's legal

27   conclusions are not accepted as true. *Iqbal*, 556 U.S. at 678.

28   ///

1    Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal

2    pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (holding that

3    pro se complaints should continue to be liberally construed after *Iqbal*).

4    **II.    ALLEGATIONS IN THE COMPLAINT**

5    Plaintiff's first amended complaint alleges as follows:

6    **A.    Defendants and Places of Employment**

7    Because Plaintiff names a number of Defendants, the Court provides the following list for

8    convenience. After this subsection, each Defendant is referred to by his or her last name.

9            1.    California State Prison - Corcoran Defendants

10   The following Defendants are employed at California State Prison Corcoran:

11   -    Correctional Officers: Estela Alcantar, M. Mercado, and Richard Huerta.

12   -    Correctional Lieutenants: John Amaya, A. Gonzales Jr., and Arnel DeLos Santos.

13   -    Assistant Warden: Jaime Perez.

14           2.    High Desert State Prison Defendants

15   The following Defendants are employed at High Desert State Prison

16   -    Correctional Officer: M. Robles.

17   -    Correctional Lieutenants: Cruz and R. Alkire.

18           3.    California State Prison – Los Angeles County Defendants

19   The following Defendant is employed at California State Prison - Los Angeles County:

20   Associate Warden: Theresa Lewandowski.

21   **B.    Factual Allegations**

22   Between February 1 and August 8, 2017, Plaintiff worked as a clerk to Correctional

23   Counselor I Castillo at Plaintiff's housing facility. Alcantar worked in the control booth of

24   building 3B04 on second watch. Alcantar verbally harassed and intimidated nearly every inmate.

25   She dehumanized them by using job names and curse words them. She violated the assigned

26   inmate phone schedule every day.

27   On about the third week of February 2017, Alcantar called a meeting with all morning

28   3B04 inmate workers including Plaintiff. Inmate Budden, who lived in cell 124 with his

3

1   roommate Snow, complained about this. She informed them that inmate Budden had "snitched on

2   her" for violating the phone schedule. She told the workers that if she saw any of them stopping at

3   cell 124, passing items for inmates Budden or Snow, or interacting with either of these inmates,

4   she would find a reason to fire them from their building job. Alcantar would tell the floor officers

5   Rodriguez or Mercado to dispose of any items she saw placed on the ledge of cell 124. Both

6   officers did so. No other inmate's door was similarly treated. Alcantar refused to open the doors

7   for cell 124 even to release them to their jobs until their supervisors demanded their workers be

8   released. "This gave the clear message to the inmates that Defendant Alcantar didn't care about

9   the rules and would retaliate against any inmate who was on her 'shit list'."[1]

10      After DeLos Santos had meetings with Alcantar, Budden, Snow, and the floor officers in

11  early March 2017, Alcantar stopped harassing Budden and Snow, but the issues with phone usage

12  denials continued.

13      Between March 1, 2017 and April 8, 2018, Plaintiff felt harassed by Alcantar. While

14  Plaintiff was working, Alcantar would order Plaintiff to "go lock up," thereby preventing Plaintiff

15  from completing his tasks. "Plaintiff att[e]mpted to speak to Defendant Alcantar in a reasonable

16  and professional manner each time but was met with derision, threat of a write-up, and accusation

17  of misconduct, or 'You know what you were doing!'" At least four times, Alcantar harassed

18  Plaintiff and accused him of misconduct while Plaintiff was conducting tasks for floor officers

19  until the officer intervened and Plaintiff was permitted to continue.

20      On April 1, 2017, Alcantar ordered Plaintiff to remove the phone sign-up list from a

21  slipcover and to bring it to her. She told Plaintiff she had a copy but wanted that copy too and

22  "[i]f the inmate's [sic] don't know what time their phone calls are then fuck them, they won't get

23  it." Plaintiff obeyed Alcantar and wrote a note to inform the other inmates about what happened

24  to the phone list and left it in the slipcover.

25      The next day, Rodriguez asked Plaintiff to mediate a dispute between two inmates and

26  Alcantar because Alcantar was threatening to write them up for putting the note concerning the

27  phone list. Plaintiff told Rodriguez he put the note there and that it was an exercise of his First

28  ──────────────
[1] For readability, some quotations change Plaintiff's capitalization without additional comment.

1    Amendment rights to free speech. Rodriguez asked Plaintiff if he really wanted to get involved,

2    "knowing how she is?" Plaintiff told Rodriguez he felt he had a duty to explain it to the

3    population. Later that morning, Rodriguez and Mercado informed Plaintiff that Alcantar was

4    intent on writing Plaintiff up for placing the note and to expect something before the end of the

5    week.

6          The following day, Alcantar spoke to Plaintiff's supervisor, Castillo. Castillo told Plaintiff

7    that he was now on Alcantar's "double shit-list" and told Castillo that she intended to write

8    Plaintiff up for putting the note in the slipcover. Castillo advised Plaintiff not to leave his cell any

9    more than necessary for a while or until Plaintiff's job changed. Later that day, additional floor

10   officers spoke with Plaintiff about the conflict with Alcantar. They advised him to watch out

11   because Alcantar said she was going to find something to give Plaintiff a write-up for in

12   retaliation for the note.

13         On April 6, 2017, Alcantar told Plaintiff, "I am going to write you up for 'inciting'

14   (inciting a riot) for you putting that note in the slip-cover." Plaintiff told Alcantar she didn't have

15   legal grounds to do so. Alcantar responded, "Then I will find something that will stick!"

16          On April 8, 2017, Mercado pulled Plaintiff out of his cell to clean various places. One

17   such place was the shower, which he cleaned with a power-wash toxic cleaning agent. Plaintiff

18   started to shower to wash the cleaning agent off. There are curtains preventing guards from seeing

19   below a prisoner's waist when he showers.  During his shower, Alcantar "buzz[ed]" the shower

20   lock several times and shouted over the PA system, "Clerk, what the fuck are you still doing in

21   the shower? Get out of there now!" Other inmates heard the incident and shouted at Alcantar.

22         After showering, Plaintiff spoke with Alcantar. Alcantar asked what Plaintiff was doing

23   that took so long. Plaintiff answered "washing," but Alcantar said, "no, you were jacking off!"

24   Alcantar had Plaintiff removed to B facility program office holding cage to be charged with

25   indecent exposure.

26         Mercado brought Plaintiff a 1083 Property Inventory sheet and claimed to have packed all

27   of Plaintiff's property into eight boxes. Plaintiff told Mercado he was prescribed reading glasses

28   and asked Mercado to give him some glasses because he could not read the inventory sheet

1  without them. Mercado told Plaintiff he had packed the reading glasses and pleaded not to make

2  him go open every box to find them. Mercado told Plaintiff he had packed all his property and

3  told Plaintiff to sign the inventory sheet. Plaintiff signed.

4          On April 10, medical staff sold Plaintiff a pair of reading glasses for $10 and given

5  treatment for chemicals Plaintiff did not fully wash off after cleaning the shower.

6          DeLos Santos visited Plaintiff and discussed the events preceding Plaintiff's being placed

7  in administrative segregation (ASU). He told Plaintiff there would be a hearing on the matter.

8  Normally, it takes 15 days to provide an inmate a copy of the charges, and 30 days from the date

9  of delivery of the charges before holding a hearing. Plaintiff believed that the investigative

10  employee (IE) would have 45 days to complete an investigation.

11          However, inmates in ASU do not have the ability to collect evidence or question witnesses

12  on one's own behalf or build a credible defense against disciplinary charges. Huerta was the IE

13  for the charges against Plaintiff. Plaintiff provided Huerta with a list of questions and witnesses to

14  the event he wanted to have questioned. He also provided Huerta a diagram of the shower and

15  requested video or camera photos showing the view Alcantar would have had of Plaintiff at the

16  time of the alleged incident to see whether she could see below his waist. Plaintiff also requested

17  a polygraph examination, which is approved by CDCR regulations. Huerta gathered no evidence,

18  questioned no witnesses, did not submit a report, and robbed Plaintiff of a defense to the charges.

19  Plaintiff appealed the denial of his right to an investigation, to call witnesses, to canvass for direct

20  witnesses, or to question witnesses of the accuser's intent to retaliate for Plaintiff's exercise of his

21  First Amendment rights.

22          In a rule violation report, Alcantar claimed that Plaintiff looked at her while masturbating

23  and she ordered him to stop. This report is wholly fraudulent. The allegations are impossible

24  because of the way the shower with its opaque curtains are constructed. In addition, witnesses

25  heard what Alcantar yelled and, if they had been questioned at an appropriate time, would have

26  remembered her stating that.

27          DeLos Santos wrote a crime incident report. Three times, DeLos Santos falsely claimed

28  that Plaintiff had two or more prior incidents of the same or similar behavior within the last year.

1    DeLos Santos placed the following restrictions on Plaintiff: "No yard access for a ten day period;

2    Exposure Control Jumpsuit during all out-of-cell activities; Solid door with yellow Placard

3    Precaution – placed on cell windows limiting inmate's view of staff." But in fact, Plaintiff had no

4    incidents of prior similar or related misconduct.

5        On April 12, 2017, Plaintiff was interviewed by psychologist Dr. Vasilescu. He

6    determined that Plaintiff did "not meet the criteria for IEX program or for a comprehensive

7    evaluation" and recommended removing the IEX jumpsuit. DeLos Santos ordered a

8    comprehensive evaluation anyway. On April 19, 2017, Dr. Vasilescu recorded that "No

9    exhibitionism diagnosis was given."

10       On April 20, 2017, psychologist Dr. R. Refern completed a mental health assessment

11   report and noted that Plaintiff had "no ongoing behavior leading to disciplinary infractions that

12   appears related to developmental disability / cognitive or adaptive functioning deficits." Three

13   more clinical psychologists agreed with Dr. Vasilescu's recommendations.

14       Plaintiff requested that DeLos Santos remove the chrono concerning the IEX jumpsuit

15   whenever he was allowed outside of his cell. DeLos Santos refused to remove it.

16       The first time Plaintiff wore the jumpsuit, it caused him extreme emotional distress. It is

17   made of heavy-duty thick vinyl with ties up the back and a padlock at the collar at the back of the

18   neck. The legs came all the way to the feet. Plaintiff could walk only by hobbling from side to

19   side "like gumby." Plaintiff could not exercise, use the bathroom, or sit comfortably with it on.

20   He contemplated suicide and/or murder each time he was forced to endure the suit to leave his

21   cell. He was not allowed to visit a doctor, to have private interviews with a psychologist, or to

22   enter the segregated yard unless he put on the jumpsuit. He was punished harshly beyond his

23   tolerance level with the jumpsuit. After he wore it only three times, he remained in his cell until

24   the restriction was lifted.

25       When Plaintiff received his ASU property on April 19, 2017, his property was missing the

26   coffee and over $345 of his belongings. Plaintiff appealed the denial of the use of his reading

27   glasses during the signing and reading. His appeals were denied. The denials ignored his

28   prescriptions for glasses going back to 2002.  Without the use of his prescribed reading glasses,

1   Plaintiff was denied the same ability to have effective communications as every other inmate in

2   similar circumstances and was as good as illiterate without an assistant.

3          On July 4, 2017, Huerta told Plaintiff that the Senior Hearing Officer spoke with Huerta.

4   The Senior Hearing Officer "indicated an intent to dismiss Plaintiff['s] charges if he withdrew his

5   request for postponement pending referral of prosecution, and stated Plaintiff may oppose but

6   would have to remain in ASU until the outcome of such referral. Under coercion, Plaintiff agreed

7   and signed to withdraw both his request for IE and postponement."

8          On July 5, 2017, Plaintiff had his hearing in a holding cell. He pleaded not guilty. Amaya

9   was the senior hearing officer (SHO). Plaintiff requested staff witnesses, inmates, and a

10  polygraph examination. He provided a diagram of the shower and requested the senior hearing

11  officer seek photos of the control view's tower of the shower. He provided a statement outlining

12  the events between February 1 and April 8, 2017. The hearing was not recorded or videotaped.

13  The holding cell had no phone jack, phone or power outlet. Plaintiff stated he did not want to call

14  Alcantar as a witness.

15         Amaya denied Plaintiff's requests for a polygraph, to present evidence, to have evidence

16  collected, and to call or canvas witnesses. He told Plaintiff, "I believe you. I have been in the

17  3B04 Control Booth and I know officers can't see below occupants['] waist[]s. I'm going to find

18  you not guilty[.]" He took Plaintiff off the exposure control jumpsuit restriction. The next day,

19  Plaintiff was transferred to California State Prison – Los Angeles County.

20         Upon arrival, Plaintiff was told by CCI Fisbeck that CSP-COR sent word that Plaintiff

21  was found guilty at his RVR hearing and placed on 90 days' loss of phones, packages, canteen,

22  property, yard and dayroom. Plaintiff alleges this is double jeopardy to his 90 days spent in CSP-

23  COR ASU. "It [w]as endorsed by Defendant John Amaya." The loss of privileges was signed by

24  Gonzales, acting for Amaya. Gonzales "had Plaintiff's record to see Plaintiff had already served

25  multiple restrictions which by regulation denied Plaintiff to serve further Loss of Privileges[.]"

26  Lewandowski was the chief disciplinary officer, and she endorsed the second restriction, serving

27  as double jeopardy to punish Plaintiff. She also signed the final copy of the disciplinary report.

28  ///

1    When Plaintiff received the final copy of the report, he found that Amaya authored an

2    entirely fictional hearing. He omitted Plaintiff's statement about the events and wrote that

3    Plaintiff claimed Alcantar mistook his cleaning the shower as masturbating. Plaintiff did not state

4    that. Amaya reported that Plaintiff waived IE and was therefore not allowed any witnesses, but

5    the regulation does not state that. It claimed Plaintiff did not call any witnesses. Additionally,

6    Plaintiff's requests for physical evidence of the shower views and request for a polygraph were

7    not in the record. Amaya falsely reported that Plaintiff called Alcantar in the hearing, which took

8    place over the telephone.

9    Plaintiff appealed. At the highest level, Perez, the chief disciplinary officer at CSP-COR,

10   ordered that the RVR must be reissued and a rehearing held, each in a certain timeframe. It did

11   not occur within that timeframe. On July 25, 2019, Plaintiff submitted another appeal, which was

12   granted due to the significant time lapse after the incident.

13   On August 23, 2019, Robles delivered a rule violation report to Plaintiff for "Indecent

14   Exposure / without prior conviction for PC 314." It was "reissued by Correctional Officer V.

15   Cathey, classified and approved by Senior Hearing Officer Correctional Lieutenant T. Sanders."

16   Reissuing the RVR violated Plaintiff's due process due to the time lapse.

17   Plaintiff provided senior hearing officer Sanders with all the same information he

18   provided Huerta. He requested that the inmates who were in the relevant areas be contacted and

19   canvassed as potential eyewitnesses, that an officer at CSP-COR take photos of the shower views,

20   that Plaintiff be given a polygraph, and that named CSP-COR staff be questioned about

21   Alcantar's threat to retaliate against Plaintiff.

22   Robles completed her IE report on December 20, 2019, which exceeded the 28 days

23   permitted. She did not attempt to collect any evidence or locate any witnesses. She did not request

24   a polygraph. She did not act as a factfinder for the senior hearing officer, as mandated by 15

25   C.C.R. § 3318(a). Robles and Cruz delivered the IE report on that day. It cited as "irrelevant"

26   almost all of Plaintiff's question to the witnesses.

27   On December 30, 2019, Plaintiff was called to an RVR hearing by Cruz. Alkire was the

28   senior hearing officer. Alkire stated he read the IE report and asked what Plaintiff had to say.

1    Plaintiff reiterated his statement about what happened. Plaintiff asked for the witnesses he named

2    to be questioned, that photographs of the shower be taken, and that he be given a polygraph.

3    Alkire denied his request. Plaintiff asked why. Alkire replied, "Because I want to." Alkire found

4    Plaintiff guilty and sentenced him to a SHU term for the offense. Alkire was biased and had a

5    predetermined belief in Plaintiff's guilt.

6    **III.    SECTION 1983**

7           The Civil Rights Act under which this action was filed provides:

8                  Every person who, under color of any statute, ordinance, regulation,
                   custom, or usage, of any State or Territory or the District of

9                  Columbia, subjects, or causes to be subjected, any citizen of the
                   United States or other person within the jurisdiction thereof to the

10                 deprivation of any rights, privileges, or immunities secured by the
                   Constitution and laws, shall be liable to the party injured in an action

11                 at law, suit in equity, or other proper proceeding for redress....

12   42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely

13   provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490

14   U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979*)); see also*

15   *Chapman v. Houston Welfare Rights Org*., 441 U.S. 600, 618 (1979); *Hall v. City of Los Angeles*,

16   697 F.3d 1059, 1068 (9th Cir. 2012); *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012);

17   *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

18          To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under

19   color of state law, and (2) the defendant deprived him of rights secured by the Constitution or

20   federal law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *see also Marsh*

21   *v. Cnty. of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state

22   law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he

23   does an affirmative act, participates in another's affirmative act, or omits to perform an act which

24   he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler*

25   *II v. Clark Cnty. Sch. Bd. of Trs*., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*,

26   588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an

27   official sets in motion a 'series of acts by others which the actor knows or reasonably should

28   know would cause others to inflict' constitutional harms." *Preschooler II*, 479 F.3d at 1183

1   (quoting *Johnson*, 588 F.2d at 743). This standard of causation "closely resembles the standard

2   'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d

3   1350, 1355 (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.

4   2008).

5           Additionally, a plaintiff must demonstrate that each named defendant personally

6   participated in the deprivation of his rights. *Iqbal*, 556 U.S. at 676-77. In other words, there must

7   be an actual connection or link between the actions of the defendants and the deprivation alleged

8   to have been suffered by Plaintiff. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658,

9   691, 695 (1978).

10          Supervisory personnel are generally not liable under § 1983 for the actions of their

11  employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a

12  supervisory position, the causal link between him and the claimed constitutional violation must be

13  specifically alleged. *Iqbal*, 556 U.S. at 676-77; *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.

14  1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). To state a claim for relief under

15  § 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would

16  support a claim that the supervisory defendants either personally participated in the alleged

17  deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or

18  promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of

19  constitutional rights' and is 'the moving force of the constitutional violation." *Hansen v. Black*,

20  885 F.2d 642, 646 (9th Cir. 1989) (citations and internal quotation marks omitted); *Taylor v. List*,

21  880 F.2d 1040, 1045 (9th Cir. 1989). For instance, a supervisor may be liable for his "own

22  culpable action or inaction in the training, supervision, or control of his subordinates," "his

23  acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that

24  showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*,

25  946 F.2d 630, 646 (9th Cir. 1991) (internal citations, quotation marks, and alterations omitted).

26  ///

27  ///

28  ///

11

1      **IV.      ANALYSIS OF PLAINTIFF'S CLAIMS**

2               **A.      First Amendment Retaliation**

3               Plaintiff alleges Alcantar violated Plaintiff's First Amendment rights by retaliating against

4      Plaintiff for informing other inmates of her actions concerning the phone list.

5               A plaintiff may state a section 1983 claim for a violation of his First Amendment rights

6      due to retaliation.  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  A retaliation claim

7      requires "five basic elements: (1) an assertion that a state actor took some adverse action against

8      an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

9      inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a

10     legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)

11     (footnote omitted); *accord Watson v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012); *Brodheim*

12     *v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

13              Here, Plaintiff satisfies the first element: he alleges that Alcantar filed a false rules

14     violation report. He satisfies the fourth element "since harm that is more than minimal will almost

15     always have a chilling effect." *Rhodes*, 408 F.3d at 567 n.11. He satisfies the fifth element for

16     now because at least for screening purposes, filing a false rules violation report does not

17     reasonably advance a legitimate correctional goal.

18              The second and third elements above require that the retaliation be against a plaintiff

19     because of his protected conduct. This requires evaluating whether Plaintiff had a constitutional

20     right to inform other inmates about an action by a correctional officer, i.e., Alcantar's removing

21     the phone list. *See Hines v. Gomez,* 108 F.3d 265, 267 (9th Cir. 1997) ("Hines' retaliation claim

22     must rest on proof that Pearson filed the disciplinary action against him in retaliation for Hines'

23     exercise of his constitutional rights and that the retaliatory action advanced no legitimate

24     penological interest."). The Court is not aware of any case establishing such a constitutional right.

25              Rather, the First Amendment rights of prisoners are subject to substantial limitations:

26              [L]awful incarceration brings about the necessary withdrawal or limitation of
                many privileges and rights, a retraction justified by the considerations underlying
27              our penal system.  In the First Amendment context a corollary of this principle is
                that a prison inmate retains those First Amendment rights that are not inconsistent
28

with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier*, 417 U.S. 817, 822 (1974) (internal quotation marks and citations omitted).

Protected activities include filing grievances, *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003), "pursu[ing] civil rights litigation in the courts," *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995), and "to send and receive mail," *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (noting the limitations of those rights). Some district courts have noted that a hunger strike, in certain circumstances, can be a protected activity. *Arredondo v. Drager*, No. 14-CV-04687-HSG, 2016 WL 3755958, at *11 (N.D. Cal. July 14, 2016) ("[A] hunger strike is protected conduct under the First Amendment if it was intended to convey a particularized message of protest and that the hunger strike was likely to be understood as a protest."); *Dumbrique v. Brunner*, No. 14-CV-02598-HSG, 2016 WL 3268875, at *11 (N.D. Cal. June 15, 2016) (same).

But there appear to be fewer protections for communications among inmates. *See Lambirth v. Cambra*, 177 F. App'x 691, 691-92 (9th Cir. 2006) (unpublished) (upholding restrictions concerning mail sent between inmates as having a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"); *Brodheim v. Cry*, 584 F.3d 1262, 1273 (9th Cir. 2009) (in dicta, contrasting protected grievances with "any open expression of disrespect or any disrespectful communication between prisoner and guard or between prisoner and prisoner").

The Court thus recommends not allowing this claim to proceed past screening because Plaintiff's complaint has not alleged that he was retaliated for exercising protected conduct under the First Amendment.

### B.    Violation of Due Process Based on Disciplinary Punishment

The Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The requirements of procedural due process apply only to the deprivation of interests encompassed by

13

1    the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S.

2    564, 569 (1972).  However, "[a] due process claim is cognizable only if there is a recognized

3    liberty or property interest at stake."  *Coakley v. Murphy*, 884 F.2d 1218, 1220 (9th Cir.1989).

4    "To state a procedural due process claim, [a plaintiff] must allege '(1) a liberty or property

5    interest protected by the Constitution; (2) a deprivation of the interest by the government; [and]

6    (3) lack of process.' " *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (quoting *Portman v.*

7    *Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).

8          The Court first looks to whether Plaintiff has alleged that he was deprived of a liberty or

9    property interest protected by the Constitution.

10          "Discipline by prison officials in response to a wide range of misconduct falls within the

11    expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472,

12    485 (1995). Thus, a change in the conditions of confinement only rises to the level of a protected

13    liberty interest if it amounts to "freedom from restraint which, while not exceeding the sentence

14    in such an unexpected manner as to give rise to the protection by the Due Process Clause of its

15    own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to

16    the ordinary incidents of prison life." Id. at 484.

17          The Supreme Court has declined to establish a "baseline from which to measure what

18    is atypical and significant in any particular prison system." *Wilkinson v. Austin*, 545 U.S. 209, 223

19    (2005) (noting inconsistent conclusions among the circuits, but concluding that assignment to

20    Ohio's "Supermax" facility satisfied this standard "under any plausible baseline"). The Ninth

21    Circuit has concluded, however, that to determine whether a particular form of restraint imposes

22    "atypical and significant hardship," a court considers a condition or combination of conditions or

23    factors on a case by case basis, rather than invoking a single standard." *Chappell v. Mandeville*,

24    706 F.3d 1052, 1064 (9th Cir. 2013) (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)

25    (confirming that the inquiry is "context-dependent" and requires "fact by fact consideration"). At

26    least three factors have been used to guide this inquiry: (1) "whether the conditions of

27    confinement mirrored those conditions imposed upon inmates in analogous discretionary

28    confinement settings;" (2) "the duration and intensity of the conditions of confinement;" and (3)

14

1    "Whether the change in confinement would inevitably affect the duration of the [prisoner's]

2    sentence." *Chappell*, 706 F.3d at 1064-65 (italics original) (internal quotation marks and citation

3    omitted). As such, "*Sandin* requires a factual comparison between conditions in general

4    population or administrative segregation (whichever is applicable) [or the prisoner's baseline

5    conditions] and disciplinary segregation, examining the hardship caused by the prisoner's

6    challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353

7    F.3d 750, 755 (9th Cir. 2003).

8         Plaintiff alleges that when he arrived at CSP-LAC, "Plaintiff was placed on 90 days loss

9    of phones, packages, canteen, property, yard, dayroom." Plaintiff also alleges that he had already

10   served 90 days in the ASU at his prior prison.  Elsewhere, Plaintiff alleges that he was forced to

11   wear an Exposure Control Jumpsuit when he left his cell for three months, and it prevented him

12   from exercising, using the bathroom, or sitting comfortably with it on.

13        Construing all facts in favor of Plaintiff at this stage, the Court finds that Plaintiff has

14   sufficiently alleged that his punishment amounted to an atypical and significant under these legal

15   standards to proceed past screening.

16        The Court next looks to whether Plaintiff received due process in relation to these alleged

17   deprivations.

18        "Prison disciplinary proceedings are not part of a criminal prosecution, and the full

19   panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418

20   U.S. 539, 556 (1974) (citation omitted). However, an inmate subject to disciplinary sanctions that

21   result in a deprivation of interest as described above must receive (1) twenty-four-hour advance

22   written notice of the charges against him, (2) a written statement by the factfinders as to the

23   evidence relied on and the reasons for the disciplinary action, (3) an opportunity to call witnesses

24   and present documentary evidence where doing so "will not be unduly hazardous to institutional

25   safety or correctional goals," (4) assistance at the hearing if he is illiterate or if the matter is

26   complex, and (5) a sufficiently impartial fact finder. *Id.* at 564-71. A finding of guilt must also be

27   "supported by some evidence in the record." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985).

28        Here, Plaintiff received written notice of the charges against him for both proceedings.

1   Regarding the first RVR proceeding, Plaintiff alleges he received a written statement by the

2   factfinder as to the evidence relied on and the reasons for the disciplinary action. For the second

3   RVR proceeding, Plaintiff alleges the factfinder provided no reasoned explanation at the time, but

4   he does not allege that he never received a written decision. Regarding both proceedings, Plaintiff

5   has not alleged that he is illiterate or that the matter was complex enough to require assistance at

6   the hearing.[2] Although Plaintiff disagrees with the factfinders, Plaintiff has not alleged facts

7   indicating that they were not "sufficiently impartial."  For example, Plaintiff does not allege that

8   any of the fact finders were involved in the underlying dispute or stood to gain from any decision.

9        Plaintiff also alleges that he did not have an opportunity to call witnesses or present

10   documentary evidence, including a photograph of the shower.  According to the facts alleged,

11   there is a disagreement whether Plaintiff waived his right to call witnesses.  The Court also notes

12   that Plaintiff requested numerous staff, inmates, and psychologists as witnesses, but it does not

13   appear that any of those witnesses actually observed Plaintiff's conduct in the shower.  It also

14   appears that those witnesses were denied for lack of relevance at the second hearing.

15        Construing all facts in favor of Plaintiff, as the Court must in this screening order, Plaintiff

16   has sufficiently alleged that he did not receive due process in the RVRs related to the deprivations

17   mentioned above because he was not allowed to call witnesses or present documentary evidence

18   even though the witnesses and would not have been unduly hazardous to institutional safety or

19   correctional goals.

20        The Court notes that Plaintiff also alleges various violations of prison rules and CDCR

21   regulations, including rules regarding the timing for preparing an investigation report and holding

22   a hearing.  These prison rules and regulations are not constitutionally mandated, however, and do

23   not independently allege a violation of the Due Process Clause of the Fourteenth Amendment.

24        Regarding whether "some evidence" supports the decision by the disciplinary officer, it

25   appears that Defendant Alcantar submitted a statement supporting the decision.  The written

26   decision also cited to a purported phone interview of Defendant Alcantar during the hearing.  If

27

28   _____

[2] Plaintiff alleges he was essentially illiterate when signing the form for his property because he lacked his glasses
then. However, he also alleges he received new glasses two days later.

16

1    that is the case, her testimony constitutes "some evidence."  However, Plaintiff alleges that the

2    interview was fabricated.  Plaintiff also alleges that the hearing officer stated during the hearing

3    that "I have been in the 3B04 Control Booth and I know that the officer can't see below any

4    inmate's waist and that the other curtains further block the view.  I'm going to find you 'Not

5    Guilty' and dismiss the charges 'in the interest of justice.'"  The Court finds, for purposes of

6    screening only, that Plaintiff has sufficiently alleged that there was not "some evidence" to

7    support the decision by the disciplinary officer.

8           Thus, construing all facts in favor of Plaintiff, the Court finds that Plaintiff has alleged he

9    was deprived of his right to due process regarding the two RVRs. [3]

10          The Court next looks to which defendants allegedly caused this lack of due process.

11   Plaintiff alleges that Amaya was the senior hearing officer for the first RVR and Alkire and Cruz

12   were the senior hearing officers for the second RVR. Plaintiff alleges that Huerta was the IE for

13   the first RVR and Robles was the IE for the second RVR. Plaintiff alleges that the loss of

14   privileges was signed by Gonzales and endorsed by Lewandowski. The Court will allow a claim

15   for violation of Due Process to proceed against these defendants.

16          **C.      Processing of Appeals**

17          Regarding Plaintiff's allegations against the appeals coordinators, prisoners do not have

18   an independent constitutional due process entitlement to a specific administrative grievance

19   procedure. *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann v. Adams*, 855 F.2d 639,

20   640 (9th Cir. 1988) (holding that there is no protected liberty interest to a grievance procedure).

21   Prison officials are not required under federal law to process inmate grievances in any specific

22   way.  Plaintiff's claims that prison officials denied or refused to process his grievances do not

23   state a cognizable claim for a violation of his due process rights because there is no right to a

24   particular grievance process or response. *See, e.g.*, *Towner v. Knowles*, No. CIV S-08-2823 LKK

---

25   [3] In analyzing these claims, the Court has largely grouped the two RVRs as they relate to the same disciplinary
26   violations and it appears that the second was held in part to rectify alleged deficiencies in the first.  However, it is not
     clear if Plaintiff suffered a deprivation from the second RVR separate and apart from the first RVR.  Additionally, to
27   the extent they are evaluated separately, it appears that the Plaintiff has not exhausted his administrative remedies as
     to the second RVR.  While the Court will allow these claims and defendants to proceed past the screening stage, it is
28   not precluding Defendants from arguing that they are separate as a matter of law and may be subject to separate
     defenses and challenges.

17

EFB P, 2009 WL 4281999, at *2, 2009 U.S. Dist. LEXIS 108469, at *5-6 (E.D. Cal. Nov. 20, 2009) (plaintiff failed to state claims that would indicate a deprivation of his federal rights after defendant allegedly screened out his inmate appeals without any basis); *Williams v. Cate*, No. 1:09-cv-00468-OWW-YNP PC, 2009 WL 3789597, at *6, 2009 U.S. Dist. LEXIS 107920, at *16 (E.D. Cal. Nov. 10, 2009) ("Plaintiff has no protected liberty interest in the vindication of his administrative claims."). Accordingly, to the extent plaintiff is trying to bring a claim based upon the way in which his grievances were responded to, these claims must be dismissed.

### D.      Deliberate Indifference to Serious Medical Needs

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted).  Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citation omitted).  Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to

18

1    establish a deliberate indifference claim.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989);

2    *Toguchi*, 391 F.3d at 1058.  Additionally, "a complaint that a physician has been negligent in

3    diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

4    under the Eighth Amendment.  Medical malpractice does not become a constitutional violation

5    merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  To establish a difference of

6    opinion rising to the level of deliberate indifference, a "plaintiff must show that the course of

7    treatment the doctors chose was medically unacceptable under the circumstances." *Jackson v.*

8    *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

9         Here, Plaintiff alleges "Mercado was deliberately indifferent to Plaintiff's medical need to

10   have prescribed eyeglasses retrieved from his property to read official documents pertaining to

11   Plaintiff's rights." However, Plaintiff's factual allegations indicate that Mercado packed

12   Plaintiff's glasses and merely requested that Plaintiff not make Mercado unpack everything to

13   find them. Plaintiff's further allegations indicate he consented to this. These allegations do not

14   establish that Mercado was deliberately indifferent. Mercado requested that Plaintiff not make

15   Mercado unpack all the boxes, but Plaintiff's allegations also indicate that Mercado would have

16   unpacked the boxes if requested.

17        In Plaintiff's objections, Plaintiff cites to *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir.

18   1996), to state that "denial of prescription eyeglasses sufficiently alleged deliberate indifference."

19   The issue here is not whether Plaintiff's medical condition is sufficiently serious. Rather, Plaintiff

20   fails to state such a claim because he fails to allege that Mercado was deliberately indifferent to

21   Plaintiff's medical issue.

22   **V.      RECOMMENDATION AND ORDER**

23        The Court has screened Plaintiff's first amended complaint and finds that it states

24   cognizable claims against Defendants John Amaya, R. Alkire, Cruz, A. Gonzales, Jr., Richard

25   Huerta, Theresa Lewandowski and M. Robles for violating Plaintiff's right to due process.

26        Based on the foregoing, it is HEREBY RECOMMENDED that:

27

28

1.   This case proceed on Plaintiff's claims against Defendants John Amaya, R. Alkire, Cruz, A. Gonzales, Jr., Richard Huerta, Theresa Lewandowski and M. Robles for violating Plaintiff's right to due process; and

2.   All other claims and defendants in Plaintiff's First Amended Complaint be dismissed, with prejudice.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within twenty-one (21) days after being served with these findings and recommendations, Plaintiff may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

In addition, it is HEREBY ORDERED that the Clerk of Court is respectfully directed to appoint a district judge for this case.

IT IS SO ORDERED.

Dated:   __**September 30, 2020**__          __/s/ Erica P. Grosjean__
                                                UNITED STATES MAGISTRATE JUDGE

20